(No. 49709

MID CENTRAL TOOL COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION et al.—(William J. Triplett, Appellee.)

*Opinion filed Sept. 19, 1978.—Rehearing denied Dec. 1, 1978.*

Henry D. Noetzel and Associates, of Peoria (Henry D. Noetzel, of counsel), for appellant.

J. Michael Madda and Walwyn M. Trezise, of Chicago (Charles Wolff, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

In proceedings under the provisions of the Workmen's Compensation Act (Ill. Rev. Stat. 1973, ch. 48, par. 138.1 *et seq.*) filed by William J. Triplett, claimant, for injuries sustained on December 15, 1973, the arbitrator found that claimant failed to prove that he sustained an accidental injury arising out of and in the course of his employment with Mid Central Tool Company, respondent. The Commission, on review, heard additional testimony, reversed the arbitrator and entered an award for permanent total disability. The circuit court of Livingston County confirmed the Commission's decision. Mid Central appealed under Rule 302(a) (58 Ill. 2d R. 302(a)).

On appeal the respondent takes the position that the accident neither arose out of nor in the course of the employment and that the disabling condition was neither caused nor aggravated by the accident.

Respondent is a small manufacturing company with about 35 employees. On Saturday evening, December 15, 1973, a Christmas party was held for its employees at the American Legion Hall in Forrest, Illinois. All arrangements were made by Marie Gaston, a payroll supervisor who worked under the direction of Mrs. Frank Griner, secretary-treasurer of the company and wife of its president.

Frank Griner, the president, was notified several months in advance that the Legion Hall had been selected for the party. He arranged to pay for the use of the facility, the food and the drink. All the food and drink was furnished by the company. None of the employees had to pay for the refreshments. Triplett testified that the employees at Mid Central did not have an employees' association of any kind and that, to his knowledge, none of the employees were consulted in regard to making any of the arrangements. He did not see or hear of any of the employees participating in the planning of the party. The employees were informed of the Christmas party by the company approximately three to four weeks in advance. A notice was posted on a bulletin board attached to a trailer office in the plant which Frank Griner occupied. Petitioner testified that the notice specified the date, time and place, and urged everybody to attend. Each employee was allowed to bring either a "wife, husband or guest." The notice was part of a long sheet of paper on which there were lines for the employees who were going to attend to so signify by signing their names and to indicate whether they were coming alone or with someone else. Several weeks before the party, a second notice was given to each of the employees reminding them to attend the party. A shipping clerk or stock chaser brought a paper around to be signed by each employee who was going to attend. Those who did not sign the paper when it was on the bulletin board signed it when the stock chaser brought it around. Further, when the employees received their pay envelopes there was, attached to the paycheck, another notice. It stated as follows:

> "Mid-Central — Christmas Party — Saturday, 15 December — Legion Hall — 7 p.m. For all employees and their wife, husband or guest. Please sign up on the list on the bulletin board in the shop. Hope we can see you there! Get your name on the list by 30 November. Management."

Frank Griner, Jr., son of the president and foreman in the plant, passed out the paychecks with the Christmas party notice attached.

Triplett testified further that a few days before the Christmas party he spoke to Frank Griner, the president, William Chapman, the general foreman, and Les Baker, the foreman of the punch presses. Baker wanted to know if Triplett was going to attend and if he was going to bring his wife. Baker said there was an opening for a punch press operator and they wanted to talk to Mrs. Triplett to see if she would come to work. Frank Griner also wanted to know if Triplett was going to bring his wife to the party and asked whether she might be coming to work for the company. Frank Griner, the president, testified, on the other hand, that he had nothing to do with the Christmas party despite the fact that he admitted he was informed of it two months in advance, gave his consent, paid for the facilities, the food and drink, and attended the party. He was asked why he paid for the Christmas parties, if he was against them. His reply was that, "Well, you no doubt know from Mr. Triplett's salary, that the salaries paid by the company aren't the greatest yet the people want something for Christmas. So out of Mid Central's generosity we picked up the tab." The arbitrator then asked him why he wrote out a company check for the party. Mr. Griner answered, "As I said, it was goodwill. The employees want to get together. I knew they really couldn't afford it, so I offered to pay for it." Inasmuch as Griner admitted that one of the purposes of a Christmas party was to create employee goodwill, he was asked whether this was what he had in mind for the 1973 Christmas party. He admitted that it was, that he knew Mid Central was going to pay the expenses for the party, and that he, as president of Mid Central, makes the decisions for the corporation and was speaking for it as its president.

Triplett testified that on Saturday, December 15, he

stopped working at approximately noon, and went home. That evening, about 7 p.m., he and his wife left home for the party. Triplett drove his car to the Legion Hall and arrived at 7:05 p.m. When he arrived there, he saw William Chapman and Frank Griner. He remained at the party for approximately one and a half to two hours. Food, consisting of sandwiches and potato salad, were served. Whiskey, beer and soft drinks were also served. No charge was made to the employees for the food or drinks.

Triplett stated he talked to Frank Griner, William Chapman and Les Baker. Griner, Triplett and his wife were standing at the bar. After a little conversation, Griner asked Mrs. Triplett if she was going to go to work for him. She told him that she had never run a punch press. He said it did not matter because Les Baker would show her what to do.

Triplett and his wife left the party at about 9 p.m. Their car was parked across the street from the Legion Hall. There had been sleet and freezing rain that day, and the streets were icy. Mr. and Mrs. Triplett left the hall and walked across the street to the car. As Triplett started to open the door for his wife to get in, his feet slid out from under him and he fell down and hit the back of his head on the icy pavement. The impact knocked him unconscious. When he woke up, he was sitting in the back of his car with his wife. Another employee was driving him home. Les Baker and William Chapman followed in another car, helped him into the house, and put him into a chair near the doorway.

As a result of the fall, Triplett suffered injury. He saw Dr. T. L. Minogue, the company doctor, the next day, who sent him to the Fairbury Hospital for X rays. They revealed a fracture of the skull. Triplett said he was suffering from headaches, dizziness, nausea and general weakness, and was referred to St. Francis Hospital in Peoria under the care of Dr. Lawrence B. Holden. He spent

most of the days from December 18 to December 26, 1973, in the hospital getting bed rest. During that time he noticed that whenever he got out of bed he experienced dizziness and was continually veering to the right when trying to walk.

After Triplett left the hospital, he attempted to work, but when he did so, he became dizzy, had headaches, felt generally weak, and would veer always to his right side when walking. If he worked 4 hours, he said it was just like being on his feet for 10 or 12 hours. As a result, he stopped working after two weeks.

Triplett then saw Dr. Dorothy H. Schultz of Champaign on January 30, 1974. After giving him a neurological examination, in which she checked his heart, blood pressure, reflexes, hearing and sight, Dr. Schultz had Triplett admitted to Mercy Hospital. He stayed there two weeks. A series of tests was made on him, including an EKG, angiogram, brain scan, and neuroencephalogram. Other tests involved sticking needles into his throat and spine and pumping fluid and air into his head. After the tests were completed, he was taken to surgery and a valve or pump was inserted into his head. The valve was connected to one tube which went into the right side of his head, and the other end was placed in his abdomen. The purpose of the pump was to relieve fluid pressure in his head. The diagnosis from the tests given to him at Mercy Hospital stated that Triplett was suffering from "post-craniocerebral trauma with skull fracture; hydrocephalus, myasthenia gravis and diabetes mellitus, borderline."

When Triplett came out of surgery, he testified he suffered a paralysis on the left side, which affected his arm and leg. He was suffering from headaches, and his nerves were bothering him. Also, while he was in the hospital, he began to notice that he was having difficulty in chewing. His jaws would become tired, and he could not chew a

number of certain meats. The muscles in his neck and eyelids would grow tired and, as a result, his eyelids drooped. These were the symptoms of myasthenia gravis.

Dr. Schultz prescribed medication for the paralysis, which cleared up to a large extent, and pain relievers and Valium for Triplett's headaches and nerves. For myasthenia gravis, he was given drugs called Mestinon and Mestinon Timespan. After leaving the hospital, and while continuing to see Dr. Schultz, he noticed that the weakness in his arms and legs was becoming worse. In addition, he was unable to use the muscles of his jaws to chew and was only capable of eating soft foods. Dr. Schultz increased the dosages of Mestinon and Mestinon Timespan. During this same period of time, Triplett continued to suffer from dizziness and headaches.

Dr. A. Edward Livingston, licensed in Illinois since 1938, a specialist in internal medicine, and affiliated with all the principal hospitals in Bloomington, examined Triplett on October 4, 1974. After completing a general examination of Triplett's eyes, ears, nose, throat, chest, heart, abdomen, genitalia, rectum and neuromuscular system, Dr. Livingston found that there were increased deep reflexes on Triplett's left extremities and a positive Romberg sign to the right. He found that the patient was unable to remain in an upright position, was subject to falling down and was unable to maintain his balance, indicating that spacial acuity had been lost. The increased reflexes indicated irritation on the right side of the brain.

A hypothetical question was propounded to Dr. Livingston. In responding to it, based on a reasonable degree of medical certainty, Dr. Livingston stated that there was a causal relationship between the accident of December 15, 1973, and the subsequent condition of Triplett's ill-being. His opinion was based on the facts that prior to the accident the patient did not have any symptoms, that as a result of the accident the patient

sustained a skull fracture, and that the patient's response to that injury followed along lines of actual damage to the brain. It was Dr. Livingston's opinion that Triplett suffered brain damage secondary to the head injury sustained in the fall. He further stated that as a result of the injury, Triplett had suffered a disturbance of the labyrinth, which impaired the balancing mechanisms extending from the ear to the brain. This condition resulted in ataxia and the positive Romberg, or falling to the right.

Dr. Livingston's report also stated that the hydrocephalic condition is a blockage of the communication of fluid between the brain and spinal canal, and was a result of damage to the brain substance. Normally, the fluid constantly circulates with absorption which maintains a specific tension in the whole system. If circulation of the fluid is blocked, as the tests revealed in Triplett's case, hydrocephalus occurs.

The hospital report introduced into the record also shows that following the injury Triplett had a myasthenia gravis condition, a destruction, to a certain extent, of the ability of the nerves to transmit impulses. The test to determine the presence of myasthenia gravis is called a tensolin test, and in Triplett's case it was positive. Dr. Livingston stated that there was a causal relationship between the accident and Triplett's myasthenia gravis. His reasons were not merely that the patient did not have the condition before that he had now, but, the doctor stated, the injury producing the hydrocephalus affecting this particular part of the brain could conceivably be in the same area. He also stated that although one would not associate hydrocephalus with myasthenia gravis, the injury that produced one could conceivably have produced the other.

Myasthenia gravis, in the doctor's experience, usually followed other illnesses such as pneumonia or similar conditions. These illnesses act as a kind of stress on the

body, which precipitate the onset of myasthenia gravis. The fact that Triplett's medications for myasthenia gravis were increased from time to time indicated, the doctor stated, that the condition was not under very good control. Dr. Livingston further stated that if the medications were withdrawn, it would put Triplett into a crisis with regard to muscular activity, which would diminish to a point where he might not be able to breathe.

First, respondent argues that this is not a compensable situation. In support of this position, it cites certain cases, which we consider inapposite.

The record here discloses that respondent had held its annual Christmas party for its employees for at least the past three years. In prior years Frank Griner, Jr., the president's son, invited the employees to dinner and drinks at a tavern in the vicinity. This proved unsatisfactory because outsiders would join the party, and it was felt that the bill was padded. The instant arrangements for the Christmas party were again made by Marie Gaston, payroll supervisor under the direction of Mrs. Frank Griner, secretary-treasurer, to be held on December 15, 1973, at the American Legion Hall. Frank Griner, the company president, was notified several months in advance that the Legion Hall had been selected. He arranged to pay for the use of the facility, the food and the drink. All the food and drink were furnished by the respondent. Mid Central, according to the claimant, did not have an employees' association.

We considered a situation with similar facts in *Lybrand, Ross Bros. & Montgomery v. Industrial Com.* (1967), 36 Ill. 2d 410. There the employer held a golf outing each year. An employee handled the arrangements for the affair, to which employees were invited. The employees were encouraged to attend. The employer provided the food and drinks and paid for the occasion. Employees arranged for their own transportation. The

claimant-employee drove 50 to 60 miles from home to the club where the outing was held and participated in the event. After leaving the club at about 12:45 a.m., he was involved in an automobile accident and died. We confirmed the award of compensation, stating:

"Besides the compelling influence to attend, important also are the facts that the employer sponsored, arranged, and wholly financed the outing. Moreover, it is fair to assume that the employer obtained the 'significant if not tangible' benefit of improved employee relations (*Jewel Tea Co. v. Industrial Com.* 6 Ill. 2d 304), and we believe the spirit and philosophy of that case controlling here." (36 Ill. 2d 410, 418.)

We held there that the ordinary "going and coming" rule denying compensation, where the injury occurs while the employee is traveling between his residence and normal place of employment, did not apply where the travel is to a place other than the normal place of employment and is undertaken incident to the employment and for the accommodation of the employer. *Lybrand, Ross Bros. & Montgomery* is dispositive of that issue here. We therefore find the Christmas party was an incident of petitioner's employment and that the injury was compensable under the Workmen's Compensation Act.

Respondent raises, as a second issue, the contention that Dr. Livingston's testimony was not sufficient to prove a causal relationship between petitioner's accident and his state of ill-being, although, according to the record before us, this was not argued before the Commission or in the circuit court. The doctor, a specialist in internal medicine practicing since 1938 and associated with principal hospitals in Bloomington, gave his opinion, based upon a reasonable degree of medical certainty, that the condition of ill-being was related to the injury: (1) the skull fracture; (2) the brain damage giving rise to the ataxia, or veering to

one side, and the positive Romberg, the inability to remain in an upright position; (3) the hydrocephalus; and (4) the myasthenia gravis. He said the brain damage produced the ataxia and the positive Romberg, and involved the ear balancing mechanism in the brain itself. "The injury producing hydrocephalus [disturbance in the fluid-draining mechanism in the brain] affecting this particular part of the brain could conceivably be in the same area [as the situs of damage giving rise to myasthenia]. In other words, one would not associate it with it, but the injury that produced one could conceivably produce the other."

Respondent offered no medical evidence in its own behalf, and the petitioner's proof of permanent ill-being stands uncontradicted and unrebutted. The Commission's finding of permanent total disability and a causal relationship between petitioner's accident and subsequent ill-being was based upon the interpretation, weight, and credibility of the unrebutted medical testimony contained in the record before it. Its determination is not against the manifest weight of the evidence and will not be disturbed.

*Judgment affirmed.*