671 P.2d 455

**In the Case of Thelma R. GRANT, Deceased.**

**Robert Earl GRANT, Claimant-Appellant,**

v.

**BROWNFIELD'S ORTHOPEDIC AND PROSTHETIC COMPANY, Employer, and State Insurance Fund, Surety, Defendants-Respondents.**

No. 13780.

Supreme Court of Idaho.

Sept. 7, 1983.

Rehearing Denied Nov. 10, 1983.

William J. Brauner, Caldwell, for claimant-appellant.

Paul S. Boyd and Hollis A. Kitch, Boise, for defendants-respondents.

BISTLINE, Justice.

Having granted a petition for rehearing, we received additional briefing from the parties. Having reconsidered the issue presented, we now reverse.

The instant appeal arises from an order of the Industrial Commission denying benefits to claimant for the death of his wife which occurred at the annual Christmas party sponsored by her employer, Brownfield's Orthopedic and Prosthetic Company. The appeal presents us with an issue of first impression in this jurisdiction: Does the accidental death of an employee occurring at an employer-sponsored Christmas party arise out of and in the course of employment for purposes of an award of workmen's compensation benefits?

Thelma Ruth Grant had been a full time employee of Brownfield's since June, 1970. On December 21, 1977, she attended the annual Christmas party sponsored by Brownfield's with her husband, Robert Earl Grant. The party was held in the evening at Crane Creek Country Club in Boise. During the party, while eating dinner, Mrs. Grant choked on a piece of meat and died from strangulation.

Mr. Grant timely filed an application for workmen's compensation benefits, alleging that his wife's death arose out of and in the course of her employment with Brownfield's. Brownfield's and its surety denied that her death was a covered accident.

Following a hearing before referee Robert C. Youngstrom, the referee entered several findings of fact, which no one disputes, and which can be paraphrased as follows: Since 1950 Brownfield's had sponsored an annual Christmas party for its employees. The management of Brownfield's both planned the 1977 Christmas party, and arranged to pay all costs associated with the party. Brownfield's acknowledged purpose in sponsoring the party was to promote good will and morale among its employees, to foster good employee relations and to provide an opportunity to socialize and to thank the employees for their work during the year. Sometime prior to the party, a notice of the date and location of the party was posted on the premises of Brownfield's inviting all of the employees of the compa-

ny to attend. The office manager subsequently ascertained the number of employees who planned to attend. Although the employees were not told that they had to attend, nine of the company's twelve employees were in attendance. The party was held in the evening, after working hours.

To reach a decision, the referee resorted to the black-letter opening paragraph from § 22.00 of the text by Larson, 1A *Workmen's Compensation Law,* p. 5–71 (hereinafter *Larson* ), to guide him in passing upon the claim:

> "Recreational or social activities are within the course of employment when
>
> "(1) they occur on the premises during a lunch or recreation period as a regular incident of the employment; or
>
> "(2) the employer, by expressly or impliedly requiring participation or by making the activity part of the services of an employee brings the activity within the orbit of the employment; or
>
> "(3) the employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life."

R., p. 38.

In making that application to the virtually undisputed facts, the referee's conclusions of law are contained in four short sentences which, with our own arabic lettering, are as follows:

> (a) "The evidence in this case does not place Ruth Grant's death in any of the categories described in the foregoing section."
>
> (b) "The Christmas party was not on the employer's premises, nor did it take place during working hours."
>
> (c) "There was no express or implied requirement that employees attend the party, nor was attendance at the party part of the services of the employees."
>
> (d) "The employer did not derive a substantial direct benefit from the parties beyond the intangible value of employee morale and good will common to such social activities."

R., p. 38.

Obviously, the referee concluded that he had performed his function if he tried to but could not fit Mrs. Grant into Larson's three black-letter categories. And that was the end of it. Nothing indicates that the referee was aware that the black-letter summary lumped together employee activities which are *recreational* and those which are *social,* and, that in the paragraph immediately following the black-letter passage, the *Larson* text shows that its concern, as outlined in the black-letter passage, was primarily only with *recreational* activities:

> "A comparatively recent development in the 'employment environment' is the widespread and increasing prevalence *of recreational activities* sponsored, encouraged or permitted in varying degrees by employers. These activities range all the way from financing a world-famous basketball team to holding a three-legged race at the company picnic. Although the cases in this field are relatively new, the principles at stake are closely analogous to those which have been discussed in connection with lunch-time injuries, going and coming, and personal comfort cases; and, on the basis of principles drawn from these fields, *an attempt is made in this section to systematize the developing law on recreational activities.*"

*Larson,* § 22.00, p. 5–71 (emphasis added). Nothing in the referee's decision indicates that he considered a subsequent passage in *Larson* which specifically covers social activities in and as a separate category:

> "When the degree of employer involvement descends from compulsion to mere sponsorship or encouragement, the questions become closer, and *it becomes necessary to consult a series of tests bearing on work-connection.* The most prolific *illustrations of this problem are company* picnics and *office parties.* Among the questions to be asked are: Did the employer in fact sponsor the event? To what extent was attendance really voluntary? Was there some degree of encouragement to attend in such factors as taking a record of attendance, paying for the time spent, requiring the employee to work if

he did not attend, or maintaining a known custom of attending? Did the employer finance the occasion to a substantial extent? Did the employees regard it as an employment benefit to which they were entitled as of right? Did the employer benefit from the event, not merely in a vague way through better morale and good will, but through such tangible advantages as having an opportunity to make speeches and awards?"

*Larson,* § 22.23, pp. 5–85 to –86 (emphasis added).

Had the referee gone beyond page 5–71 and asked himself the questions found on page 5–85, set forth above, he not only would have found his task easier, but his result more just and in accordance with the liberality which the legislature declares sets the tone in administering the Act. We examine the findings of the referee in light of the foregoing *Larson* questions:

1. "Did the employer in fact sponsor the event?" This is according to the case law without doubt the singularly most important question. An answer to that *Larson* question is readily found in the Findings of Fact:

"Ruth Grant died at a Christmas party sponsored by her employer, . . . ."

Finding of Fact I, R., p. 35.

Yet, observe that in the rather terse black-letter passage, the fact of sponsoring is given no mention whatever, because *Larson* assumes that legal minds may readily conclude that sponsoring a company party is almost the end of all necessary inquiry.

2. "Did the employer finance the occasion to a substantial extent?

The answer to this extremely important question is not only found in the findings of the referee, but also found there is the answer to an even more damaging question, one *Larson* either failed to think of, or again believed to be so beyond question as establishing liability as not worthy of mention, i.e., *did the employer deduct his party as business expense in reporting the company's taxable profit?*

"The party was planned by the president of the employer, and was to be paid for entirely by the employer. No employees have ever paid any part of the cost of a Christmas party. The employees made no arrangements for the party, except that employees arranged to draw names for the presentation of small gifts. The employer made all arrangements and reservations.

. . . .

" . . . The employer deducted the cost of the parties from its income tax returns as a business expense."

Findings of Fact VI and IX, R., p. 37.

3. "Was there some encouragement to attend in such factors as [a] taking a record of attendance, . . . or [d] maintaining a known custom of attending?"

An answer to 3[d] is available in the referee's findings:

"It was the custom of the employer to sponsor an annual Christmas party for its employees. These parties had been held since 1950. For several years prior to 1977, the parties had been held at the Crane Creek Country Club, in Boise."

Finding of Fact IV, R. p. 36.

The findings of the referee do not furnish an answer to question 3[a], but it is readily available from documentation supplied by the employer and found in the record. Eleven months after Mrs. Grant's death the employer was able to and did file with the Commission a statement providing the names of those employees who did attend, and those who did not attend. (Employer's Answer to Interrogatory No. 7(g).) The employer also kept attendance tabs sufficiently well to be able to state that since parties began in 1950, and were held annually thereafter, employee attendance ran between 75 percent to 80 percent. (Employer's Answer to Interrogatory No. 5(c).) Of the four employees who did not attend the 1977 party, three were no longer employed when the attendance was later inquired into. (Employer's Answer to Interrogatory No. 23.)

4. "Did the employer benefit from the event, not merely in a vague way through better morale and good will, but through

such tangible advantages as having an opportunity to make speeches and awards?"

The answer to this question is found in the referee's findings:

"The employer's purpose in sponsoring the Christmas parties was to promote good will and morale among its employees, to foster good employee relations and to provide an opportunity to socialize and *to thank the employees for their work during the year.* The employer deducted the cost of the parties from its income tax returns as a business expense."

Finding of Fact IX, R., p. 37 (emphasis added). The finding as written leaves it unclear whether Mr. Brownfield, the president of the company, would at the party make a speech which at one time thanked the employees for their work, as contemplated by the *Larson* text, or would individually speak to each employee on a more personal basis. Other evidence in the record establishes that the employer made awards of cash bonuses at the party, although it also appears that those who could not or did not attend might later get such awards at the company store.

The *Larson* questions which have been in turn set forth and answered from the appeal record are taken from § 22.23, which section follows another section, § 22.22; § 22.22 addresses only "Employer Compulsion," *Larson,* p. 5–83. Section 22.23 was written in relation to *non-compulsion* settings, and suggests that "[w]hen the degree of employer involvement descends from compulsion to mere sponsorship or encouragement, the questions become closer, and it becomes necessary to consult a series of tests bearing on work-connection." *Larson,* p. 5–85. In this case counsel for claimant made no contention of outright compulsion. This is made clear in the Reporter's Transcript, when the employer's witness, corporate employee Jones, was on the stand:

"Q. He's asked you about going or not going. If you had had another engagement that you felt that you wanted to go to, would you have had any feeling about going to that instead of to the Christmas party?

"MR. BRAUNER: Your Honor, this question calls for a conclusion of the witness. It's obvious he didn't have another engagement. I think we're getting into some very speculative areas.

"MR. BOYD: I think it goes to this question that they are trying to show that Brownfield required them to attend.

"MR. BRAUNER: I don't think anybody contends that.

"MR. BOYD: You agree that he did not require them to attend?

"MR. BRAUNER: I think that the record's clear that there was no absolute requirement that they attend."

Tr., p. 63–64.

It was again made clear on claimant's motion for reconsideration made after the Commission approved the referee's decision. Therein the claimant stated: "Compulsion to attend or a requirement to work at a party is *not a decisive factor by itself* under the law." R., p. 40 (emphasis added).

It becomes apparent, then, that the referee in the first instance and the Commission in the second are guilty of over-emphasizing that one factor—especially to the point of ignoring others, and especially ignoring the further *Larson* § 22.23 which speaks in terms of encouragement. We do not readily grasp the thought which the referee had in mind where he concluded that "[t]here was no express or implied requirement" of attendance. Conclusion of Law II, R., p. 38. Apparently, it could be surmised that he thus attempted to rule out *any* thought that Brownfield employees might feel obliged to attend the employer's Christmas party. The evidence simply does not sustain that conclusion. The referee, had he continued to read on into § 22.23, might have seen that "encouragement" need not be, and ordinarily is not, mandatory in the form by which it manifests itself.

On the other hand, an express requirement is couched in mandatory terms. An implied requirement again comes from the mouth of he who requires; it is not mandatory, but at the same time it carries a message and it is meant to carry a message: "You aren't required to come to our party.

I wouldn't force you to do that, and it might even be illegal to do so. On the other hand, the first week in January, we will be handing out the new working schedules, and probably be considering pay raises. We think everyone else is finding time to come." Such is offered as an example of language *implying* a requirement of the employer.

Unfortunately, a great many people make no distinction between the words "imply" and "infer." To imply is the language used by the implier. To infer, however, is the interpretation of that language or conduct by the listener, here Mrs. Grant. The referee entirely failed to consider what she might have inferred from the employer's near thirty-year custom of sponsoring Christmas parties—whether she did or did not know that it was not all being written off tax-wise as a business investment in continued employee good relations and loyalty. Mr. Brownfield, after all the years Mrs. Grant had been with the company, said of her:

"Q. You considered her a loyal employee; did you not?

"A. Sure did.

"Q. Does it surprise you that if she said she would be at the party that she would feel an obligation to come?

"A. I'm sure she would."

Tr., p. 54.

Claimant, on cross-examination was asked and answered as follows:

"Q. Did anybody ever call you at home and say, now be there, or anything of that substance?

"A. Not to me. My wife was the one."

Tr., p. 37.

On direct examination, the claimant had remembered:

"A. Well, she came home from work and she was getting dressed and I was changing my clothes and she says, Dad, I don't want to go to that dinner tonight.

. . . .

"A. I said I didn't want to either and she said, well, I've got to go, it's part of

my job. And I said, well, okay. And she said, now, I'm not going to go early enough to have any highballs. Occasionally we did, but we was not drinking people. We would have a drink, but when she'd come home from work I'd say, you want a little drink or something? She'd say, no, I'd rather have a cup of coffee."

Tr., p. 19–20.

Returning to *Larson's* black-letter law, into which the referee believed he had to fit Mrs. Grant, we pause to mention, that the referee's conclusion (a): "The evidence in this case does not place Ruth Grant's death in any of the categories described in the foregoing section," serves primarily to demonstrate his belief that Mrs. Grant had to be categorized in the black letter law. Conclusion (b): "The Christmas party was not on the employer's premises, nor did it take place during working hours," is of doubtful validity for two reasons. Christmas dinner parties are not ordinarily held during working hours, and it is difficult to conceive that the employer's traditional Christmas dinner party would be held at his place of business.

It would also seem that where an employer, such as in this case, does have Christmas parties and uses company money (deductible) with which to obtain a premises, together with its food and libation, it is no great fiction to accept those premises, as used for such purposes, as the premises of the employer. In the slightly related field of company picnics, which *Larson* notes are invariably on company time (not so with evening dinner parties), *Larson* states that "both the time and space limits of the employment are expanded to picnic-day *at the picnic-grounds.*" *Larson*, § 22.23, p. 5–91 (emphasis added).

Conclusion (c): "There was no express or implied requirement that employees attend the party, nor was attendance at the party part of the services of the employees," is referrable to *Larson,* but it was not an issue. Encouragement to attend, and inferences an employee might properly draw from a long time work relationship and a long time custom of Christmas parties was

the issue, but was not touched upon—the resolution of which could only have gone against the employer on the record we see.

Conclusion (d): "The employer did not derive a substantial direct benefit from the parties beyond the intangible value of employee morale and good will common to such social activities," is referrable to the black-letter law confirming that employee morale and good will are recognized as substantial benefits.

While black-letter law may be of some aid in reaching conclusions of law in a case which is of first impression, we also look to the law of other jurisdictions.

One of the more lucid opinions in this regard is the decision in *Moore's Case,* 330 Mass. 1, 110 N.E.2d 764 (1953). The court stated that an injury or death of an employee will be deemed compensable where the employee's attendance at the employer-sponsored social activity in some logical manner pertains to or is incidental to his employment, *i.e.,* there must be a showing that the employee's injury or death and his employment are causally connected. 110 N.E.2d at 766. In determining whether the employee's attendance at the employer-sponsored social activity and his employment were sufficiently related to warrant an award of compensation for an injury or death sustained by the employee in connection with the activity, the court set forth the following criteria to be examined: (1) the "customary nature of the activity"; (2) the "employer's encouragement or subsidization" of it; (3) the employer's management or direction of the enterprise; (4) the "presence of substantial pressure or actual compulsion upon the employee to attend and participate"; and (5) whether the employer expects and/or receives a benefit from the employee's attendance and participation in the activity. 110 N.E.2d at 766–67 (citations omitted). As the court in *Moore's Case* noted, the criteria is not to be considered an exhaustive list, and "[w]hat is required in each case is an evaluation of the significance of each factor found to be present in relation to the enterprise as a whole." 110 N.E.2d at 767.

In *Sica v. Retail Credit Co.,* 245 Md. 606, 227 A.2d 33 (App.1967), a recreational case, an employee was injured while swimming during a company sponsored annual picnic. Attendance was voluntary. No business was transacted nor were any speeches made at the outing. Nonetheless, it was determined that the employer encouraged and authorized the formation of an employee picnic committee and its activities, paid all expenses of the picnic, and deducted them as a business expense for income tax purposes. On the basis of these later facts, in connection with the testimony that the occasion promoted the enthusiasm which was a necessary element in the employer's service business, the court found coverage because "the employer derived substantial direct benefit from the activity . . . ." 227 A.2d at 40. The *Sica* decision is cited as authority in two other Maryland cases. In *Mack Trucks, Inc. v. Miller,* 23 Md.App. 271, 326 A.2d 186 (Spec.App.1974), *affirmed,* 275 Md. 192, 338 A.2d 71 (1975), an employee was injured during a scheduled afternoon "coffee break" while playing touch football on a grass plot owned by his employer, in front of the building where he worked. This particular recreational activity was not authorized by the employer, but was permitted by the employer's acquiescence over a three-month period. In upholding an award of workmen's compensation benefits, the court cited *Sica* for the proposition "that when an employer encouraged, authorized and underwrote the costs of recreational activities [the activity is sufficiently work-related to be an incident of employment]." 326 A.2d at 187. The court further reasoned that there was very little difference between the case before it and the situation present in *Sica.*

"We find it difficult to distinguish a recreational activity *encouraged* during free time (a Saturday picnic once a year) in *Sica* from a far shorter free time recreational period provided during each working day (a 15 minute 'coffee-break'). *Sica* was *encouraged* to take advantage of the relaxation and recreation and to socialize with fellow employees, although

not necessarily expressly encouraged to swim or play ball. So indeed Miller was *encouraged* if not required to avail himself of the free time provided, and although not *encouraged* to play touch football, was permitted to do so with the employer's knowledge over a period of at least three months. Not only do the employer's actual knowledge and acquiescence establish the recreational activity as an 'incident of employment,' but the period over which it had persisted would, itself, permit that inference."

326 A.2d at 188 (emphasis in original). A similar conclusion was arrived at in the recreational case of *Selected Risks Insurance Co. v. Willis,* 266 Md. 674, 296 A.2d 424 (App.1972). The case involved the death of an active member of a volunteer fire company which occurred while he was swimming at an annual picnic held by the company. The outing was organized and sponsored by the company. The members of the company were expected to attend. Summary judgment was granted in favor of the decedent's estate against Selected Risks for benefits under a policy issued by the insurer covering the loss of life of members of the company suffered "by reason of and in the course of duties as a member of said Fire Company." The summary judgment was affirmed. 296 A.2d at 426. Noting that the insurance policy provision was similar to workmen's compensation cases involving questions of whether an injury "arose out of and in the course of employment," the court determined that the case was controlled by *Sica,* stating that

"if the drowning of an employee at a company-sponsored picnic arose out of and in the course of his employment, then the drowning of a fireman at a work-related picnic scheduled and sponsored by the fire company was, in the language of the policy now before us, suffered 'by reason of and in the course of duties as a member of said Fire Company.' "

296 A.2d at 425.

Another drowning during a company picnic was involved in *Feaster v. S.K. Kelso & Sons,* 22 Pa.Cmwlth. 20, 347 A.2d 521 (1975).

Relying in part on *Sica,* the court affirmed an order awarding compensation benefits on behalf of the widow and children of the deceased employee. The stipulated facts were that the picnic at which the employee met his death was sponsored by his employer, the food was supplied by the employer, the picnic was announced by a poster at the place of employment, and the company picnic had become an annual event. The referee found in addition to these facts, that the picnic promoted good employee-employer relations. As to this finding, the court concluded that it "was a fair one and it supports the conclusion that the decedent was killed while engaged in the furtherance of the business or affairs of his employer." 347 A.2d at 524.

Similarly, in *Tietz v. Hastings Lumber Mart, Inc.,* 297 Minn. 230, 210 N.W.2d 236 (1978), a drowning which occurred during a company picnic was held to have arisen out of and in the course of employment. 210 N.W.2d at 237. In so holding, the following facts were deemed persuasive:

"The picnic was an annual outing sponsored and financed by the Hastings Lumber Mart, Inc., for the benefit of all of its full-time male employees. Full attendance was actively encouraged and actual attendance was usually close to 100 percent. The outing was held on a workday afternoon chosen in advance to provide as little conflict as possible with other obligations of the employees. Those who attended received a full day's pay. Those who did not attend were not required to work as the business premises were closed at noon on the day of the outing. However, some wage adjustment was made for those not attending, either by a reduction in the employee's sick leave or, in one case, by a direct docking of wages." 210 N.W.2d at 237.

Attention must also be drawn to the case of *Kohlmayer v. Keller,* 23 Ohio St.2d 10, 263 N.E.2d 231 (1970). The court in *Kohlmayer* articulated a "business-related benefit" test to establish a nexus between an employee's recreational injury and workmen's compensation benefits. The case in-

volved an employee injury sustained while attending a picnic sponsored, paid for and supervised by the employer for the purpose of generating friendly relations with his employees. The court held that as a matter of law the picnic resulted in a business-related benefit to the employer sufficient to support the injured employee's participation under the workmen's compensation act. 263 N.E.2d at 234. The court stated that:

> "Improved employee relationships which can, and usually do, result from the association of employees in a recreational setting produce a more harmonious working atmosphere. Better service and greater interest in the job on the part of the employees are its outgrowths. The expense of the picnic may furnish the basis for an income tax deduction as a business expense. Tangible business benefits are even more likely to be realized where, as here, a small business is involved.
>
> "Thus, business-related benefits, even though not immediately measurable, which may be expected to flow to the employer from sponsoring a purely social event for his employees, are sufficiently related to the performance of the required duties of the employee so that it is 'correct to say that the Legislature intended the enterprise to bear the risk of injuries incidental to that company event.'"

263 N.E.2d at 233 (citations omitted). *Mid Central Tool Co. v. Industrial Commission,* 72 Ill.2d 569, 21 Ill.Dec. 858, 382 N.E.2d 222 (1978), held compensable an employee's injuries sustained by a slip and fall after a company-sponsored Christmas party. The Illinois Supreme Court relied on the facts that the annual Christmas party had been held for the past three years, that all arrangements were made by a supervisor and all food and drink were furnished by the employer. The court cited and quoted *Lybrand, Ross Brothers & Montgomery v. Industrial Commission,* 36 Ill.2d 410, 223 N.E.2d 150, 154 (1967):

> " 'Besides the compelling influence to attend, important also are the facts that the employer sponsored, arranged, and

wholly financed the outing. Moreover, it is fair to assume that the employer obtained the "significant if not tangible" benefit of improved employee relations, and we believe the spirit and philosophy of that case controlling here.' "

382 N.E.2d at 226 (citations omitted).

Other Christmas party cases include *Du Charme v. Columbia Engineering Co.,* 31 N.J.Super. 167, 106 A.2d 23 (App.Div.1954), and *Beauchesne v. David London & Co.,* 118 R.I. 651, 375 A.2d 920 (1977). In *Du Charme,* the court affirmed an award of compensation benefits, holding that the injuries sustained by an employee while leaving a company-sponsored Christmas party held on the company premises arose out of and in the course of employment. 106 A.2d at 25. In so holding, strong emphasis was placed on the testimony of the general manager of the company that the purpose of the Christmas party was to further good future labor-management relations. As such, the court concluded that it could not be said that the Christmas party was merely the employer's gratuity for the exclusive benefit of the employees. *Id.* In *Beauchesne,* the employer appealed from a decree of the Rhode Island Workmen's Compensation Commission awarding total disability benefits to claimant for injuries sustained at an employer-sponsored Christmas party. The party was sponsored by and paid for by the employer. Even though the employee's attendance at the party was purely voluntary, all the employees attended. One employee did leave early without telling anyone. During the party paychecks and Christmas bonuses were distributed to the employees in attendance. The claimant became intoxicated and fell from a window on the third floor offices of the company building. In affirming the award of total disability benefits to claimant, the Rhode Island Supreme Court focused on the degree of indirect pressure the employees felt to attend the party as well as the degree of benefits, if any, the employer might receive from the party. As to the first inquiry, the court took a realistic view of the employee-employer relationship, recognizing that indi-

rect pressure by the employer may constitute a compelling influence upon the employees to bring their attendance at the social affair within the orbit of employment.

> "The party was held in the plant during a period usually reserved for work and for which the employees were actually paid. While the party may not be classified as an expressed 'command performance' for the employees, one can certainly conclude, as did the commission, that their attendance was expected. The testimony giving rise to that inference rests on the facts that the weekly paychecks and the bonus checks were given to all of the employees at the party by one of the London brothers. Additionally, all employees and the three brother-employers attended. As one court has noted, '[l]iteral compulsory attendance at the company's affairs would not have produced the desired employee enthusiasm * * *. It would not be realistic to find that respondent's complete control of the [party] and the inducement to the employees of wages without work while enjoying the affair did not constitute a far greater and more effectual compulsion upon the employees" than mandatory attendance. *Kelly v. Hackensack Water Co.,* 10 N.J. Super. 528, 536, 77 A.2d 467, 471 (1950)."

375 A.2d at 922–23.

The other relevant aspect of the *Beauchesne* decision is the court's discussion with respect to the question of what, if any, benefit the employer expected to receive °from its annual Christmas party. In this regard, the court stated:

> "When the president of the company was asked if the goal .of the Yuletide festivities was the promotion of good fellowship, he replied that an event is a 'common thing' and that '[w]e have always had a Christmas party.' These responses were a clear indication that management felt that a Christmastime get-together financed by the company did much to create good will between labor and management. Certainly improved employee relationships, which can and frequently do result from such activities, create a

more congenial working atmosphere. *Kohlmayer v. Keller,* 24 Ohio St.2d 10, 12, 263 N.E.2d 231, 233 (1970). This in turn produces .greater job interest and better service. Additionally, the expense of the party may constitute a business expense for income tax purposes and, as the *Kohlmayer* court observed, '[t]angible business benefits are even more likely to be realized where, as here, a small business is involved.' *Id.* Thus, we agree with the proposition that benefits may accrue to an employer from a purely social affair. *Id.* at 13, 263 N.E.2d at 233; *Ricciardi v. Damar Prods. Co.,* 45 N.J. 54, 211 A.2d 347 (1965); *Hill v. McFarland-Johnson Eng.,* 25 A.D.2d 899, 269 N.Y.S.2d 217 (1966)."

375 A.2d at 923.

In this regard, it is to be emphasized that we accept all of the findings of fact entered by the referee and approved and confirmed by the Industrial Commission, as well as the undisputed fact that claimant's wife believed her attendance at the Christmas party was obligatory. In instances such as this, the Industrial Commission's conclusions of law on the issue before us are not necessarily binding. As was stated in the case of *In re Haynes,* 95 Idaho 492, 496, 511 P.2d 309, 313 (1973):

> "The problem in this case arises over the fact that the Industrial Accident Board has made findings to the contrary and this Court has a rule of long standing that the findings of the Industrial Accident Board will not be disturbed on appeal if they are supported by substantial and competent evidence. . . .
>
> "In this case, however, we are of the opinion that the Board's findings are not supported by the evidence. This is not a case of conflicting evidence which the Board has resolved in favor of one party or the other, but a case involving the legal effect to be given to evidence which was primarily uncontroverted though somewhat weakened by cross examination. . . .
>
> " . . . [C]onstruing the Act liberally in favor of compensation, we are of the

opinion that the findings of the Industrial Accident Board are not supported by the record. Accordingly, the order entered by the Board denying claimant benefits as the surviving widow is reversed and remanded for disposition consistent with this opinion."

Where evidence in a case is undisputed, or virtually so, a question of law is presented as to whether the Industrial Accident Board has made proper application of the law to the facts. ID. CONST. art. 5, § 9. *Ledesma v. Bergeson,* 99 Idaho 555, 585 P.2d 965 (1978); *Wachtler v. Calnon,* 90 Idaho 468, 413 P.2d 449 (1966); *Hix v. Potlatch Forests, Inc.,* 88 Idaho 155, 397 P.2d 237 (1964); *Beutler v. MacGregor Triangle Co.,* 85 Idaho 415, 380 P.2d 1 (1963). The workmen's compensation law is to be construed liberally in favor of the claimant. *Hattenburg v. Blanks,* 98 Idaho 485, 567 P.2d 829 (1977).

On the basis of the undisputed facts, nearly all of which are encompassed in the findings of the referee, as a matter of law, the conclusion is inescapable that Mrs. Grant's fatal accident occurred within the scope and course of her employment. Such was the sole issue. We hold in favor of the claimant, reversing the Commission order denying benefits, and on remand direct the entry of an award in favor of claimant.

Costs to claimant.

HUNTLEY, J., and McFADDEN, J. (retired), concur.

BAKES, Justice, dissenting.

The majority begins its opinion by incorrectly stating the issue to be decided by this Court as follows: "Does the accidental death of an employee occurring at an employer-sponsored Christmas party arise out of and in the course of employment for purposes of an award of workmen's compensation benefits?" *Supra* at 542. However, the issue to be decided on appeal is not whether Mrs. Grant was injured while in the course and scope of her

employment. That was the issue before the factfinder in this case, the Industrial Commission. The issue on appeal is whether there is substantial and competent evidence in the record to support the Industrial Commission's ultimate finding that "the accident which caused the death of Ruth Grant did not arise out of and in the course of her employment."

Whether an injury arises out of and in the course of employment is a factual issue to be resolved by the Industrial Commission upon the attendant facts and circumstances of each case. *Teffer v. Twin Falls School Dist. No. 411,* 102 Idaho 439, 631 P.2d 610 (1981); *Colson v. Steele,* 73 Idaho 348, 252 P.2d 1049 (1953); *Smith v. University of Idaho,* 67 Idaho 22, 170 P.2d 404 (1946). The Idaho Constitution and previous decisions of this Court mandate that on appeal our review of Industrial Commission decisions is limited to questions of law. Idaho Const. Art. 5, § 9. The findings of the Industrial Commission will not be disturbed on appeal when supported by substantial and competent evidence. *See Case of Graham,* 103 Idaho 824, 654 P.2d 1377 (1982); *Bush v. Bonners Ferry School Dist. No. 101,* 102 Idaho 620, 636 P.2d 175 (1981); *Lampe v. Zamzow's, Inc.,* 102 Idaho 126, 626 P.2d 782 (1981). Therefore, however popular the cause or grievous the injury, and regardless of our individual and personal feelings on how a case should have been decided, we are not entitled to weigh the evidence or make findings or substitute our judgment for that of the commission.

In misperceiving the issue to be decided on appeal, the majority, contrary to the constitutional limitations on our review of Industrial Commission findings, usurps the Industrial Commission's factfinding function and finds that Mrs. Grant's accident arose out of and in the course and scope of her employment. This is a finding of ultimate fact to be decided by the trier of fact rather than by this Court on appeal.[1] Re-

---

1. This Court recently has been inclined to usurp the factfinding function of the Industrial Commission, *see, e.g., Barker v. Fischbach & Moore, Inc.,* 105 Idaho 108, 666 P.2d 635 (Idaho Sup.Ct.1983); *Gray v. Brasch & Miller Constr. Co.,* 102 Idaho 14, 624 P.2d 396 (1981); *Bowman v. Twin Falls Constr. Co., Inc.,* 99 Idaho 312, 581 P.2d 770 (1978); *Lyons v. Indus-*

peating, since it bears repeating, the issue for our review is not whether Mrs. Grant's death arose out of the course and scope of her employment, which requires a finding of ultimate fact, but is whether there is substantial and competent evidence in the record to support the Industrial Commission's finding that her accident did not arise in the course and scope of her employment.

The majority, having misstated the issue and then assumed the role of factfinder, proceeds to decide the issue in favor of the plaintiff appellant, stating that "the conclusion is inescapable that Mrs. Grant's fatal accident occurred within the scope and course of her employment." In an attempt to mask its factfinding, the majority suggests that the Industrial Commission's referee may have committed an error of law. Specifically, the majority criticizes the referee's reliance on the so-called "black letter" law appearing as § 22.00 in Larson's, *The Law of Workmen's Compensation,* at p. 5–71, as set out at page 456 of the majority opinion.

### I.

The majority's criticism of "black letter" law is erroneous in two respects. First, the majority suggests that there is something sinister about "black letter" law, specifically that law appearing as Section 22.00 in Larson's, *The Law of Workmen's Compensation,* at p. 5–71. I find the majority's criticism of the Industrial Commission for applying "black letter" law somewhat disconcerting. Black's Law Dictionary defines "black letter law" as "an informal term indicating the basic principles of law generally accepted by the courts and/or embodied in the statutes of a particular jurisdiction." How does a tribunal, such as the Industrial Commission, err by applying "the basic principles of law generally accepted by the

courts . . .?" When cases are tried before a jury rather than before the Industrial Commission as factfinder, judges instruct juries, at the behest of the counsel, on "the basic principles of law generally accepted by the courts," *i.e.,* "black letter law," from which the jury then determines the ultimate facts of the case. The majority's criticism of the Industrial Commission for applying so-called "black letter law," *i.e.,* "the basic principles of law generally accepted by the courts," is really a prelude and masks the real reason for the majority's decision. If the majority was reversing the Industrial Commission because it had applied the law erroneously, the proper procedure would be to reverse the commission's order and remand the matter to the Industrial Commission to redetermine the case after first applying the correct law. This Court recently took that course in *Ross v. Fiest,* 105 Idaho 119, 666 P.2d 646 (1983). That was also the course taken in *Moore's Case,* 330 Mass. 1, 110 N.E.2d 764 (1953), prominently relied on in the majority opinion. However, the Court has not remanded the matter to the Industrial Commission asking it to redetermine the case after applying the correct law following *Ross v. Fiest, supra.* Rather, after criticizing the Industrial Commission's use of "black letter" law, the majority then proceeds to decide the factual issue without remanding the matter to the Industrial Commission to redecide the question applying proper law. Obviously, the majority is not reversing the Industrial Commission for applying the wrong law, "black letter" or otherwise, but rather the Court is reversing the Industrial Commission because it views the facts differently than the Industrial Commission did.

### II

Aside from the majority's inappropriate criticism of the Industrial Commission's use

---

trial *Special Indemnity Fund,* 98 Idaho 403, 565 P.2d 1360 (1977), always, it seems, in favor of claimants. A generation ago this Court yielded to a similar urge to retry the facts, only then seemingly in favor of employers. *See Johns v. S.H. Kress Co.,* 78 Idaho 544, 307 P.2d 217 (1959). That opinion has been severely criticized by the author of today's majority opinion.

*See Woodhams v. Ore-Ida Foods, Inc.,* 101 Idaho 369, 613 P.2d 380 (1980) (Bistline, J., dissenting); *Matthews v. Bucyrus-Erie,* 101 Idaho 657, 619 P.2d 1110 (1980) (Bistline, J., dissenting). What the Court does today is no different than what it did in *Johns v. S.H. Kress Co., supra.* In either case, we violate the Idaho Constitution by retrying the facts.

of "black letter law," the majority's analysis of Section 22.00 in *Larson,* is erroneous. First, quoting the section's introductory textual paragraph, *ante* at 456–457, the majority urges that the rules set out in § 22.00 apply only to recreational, as opposed to social events. This argument is unsupported. Section 22 in *Larson* is entitled, in bold face print, "Recreational and Social Activities." Section 22.00 begins, "Recreational or social activities are within the course of employment when ...," and no distinction in the applicability of the three enumerated sections appears elsewhere on the face of the rule.

The majority's argument that the "black letter" rules set out at § 22.00 apply only to recreational activities is further negated when one views the complete text of section 22. The introductory phrase pointed to by the majority concludes that "an attempt is made in this section to systematize the developing law on recreational activities." The analysis which follows in § 22 is not, however, limited to recreational activities but includes an in-depth discussion concerning whether recreational and social activities are to be considered within the course and scope of employment, in light of such factors as whether the injury occurred on the premises, § 22.10; the degree of employer sponsorship of the activity, whether recreational or social, § 22.20; and whether the activity results in benefit to the employer, § 22.30. Thus, the majority's first premise, *i.e.,* that the general rules stated by *Larson* at § 22.00 were intended to apply only to recreational activities and events, is erroneous.

The majority, without so holding, also implies that the referee and the Industrial Commission erred in failing to consider the entire text of Section 22, and, specifically, in failing to consider a paragraph contained in Section 22.23, set out at pages 543–44 of the majority opinion, which suggests several pertinent questions to be asked in determining whether an injury is employment related. The majority states that "had the referee gone beyond page 5–71 and asked himself the questions found [in Section 22.23] he not only would have found his task easi-

er, but his result more just and in accordance with the liberality which the legislature declares sets the tone of administering the act." *Ante* at 544. It is pure speculation to state that the referee would have arrived at what the majority apparently thinks is a "more just" result had he specifically applied the questions suggested by *Larson* to the facts of this case. The record neither demonstrates that the referee failed to consider the entire text of Section 22, nor that the referee, had he expressly answered the questions posed, would have reached a different conclusion.

The resolution of factual matters is committed to the expertise of the Industrial Commission, which specializes in hearing industrial accident cases. *See Dawson v. Hartwick,* 91 Idaho 561, 428 P.2d 480 (1967); *Clark v. Brennan Constr. Co.,* 84 Idaho 384, 372 P.2d 761 (1962); *Kernaghen v. Sunshine Mining Co.,* 73 Idaho 106, 245 P.2d 806 (1952). The expertise acquired by the commission in its day-to-day involvement in and resolution of workmen's compensation disputes should not be interfered with on appeal, particularly where there is no affirmative showing that the commission or hearing referee failed to apply the law correctly. "The Commission by reason of its makeup and experience is possessed of certain expertise in these matters to which the court should defer." *Matthews v. Bucyrus Erie Co.,* 101 Idaho 657, 662, 619 P.2d 1110 (1980) (Bistline, J., dissenting).

Without suggesting that the referee was required to expressly answer each of the questions recommended in *Larson,* Section 22.23, as contended by the majority, a number of the referee's findings of fact provide answers to the suggested questions. The referee found: the Christmas party was sponsored by the employer (sponsorship); employees were not compelled or required to attend, and that each was free to attend or not attend as he so desired (voluntariness of attendance); the party was customarily held each year and that this party was held in the evening outside of normal working

hours and off the business premises[2] (degree of encouragement to attend); the party was to be paid entirely by the employer (whether financed by the employer); and, that the employer's purpose in sponsoring the Christmas party was to promote good will and morale among the employees and that the employer deducted the cost of the parties on its income tax returns (benefit to employer). In light of these findings, which adequately encompass the questions suggested by *Larson* in Section 22.23, the referee properly applied the law found at Section 22.00, and the Industrial Commission cannot be faulted in its application of the law.

### III

Finally, the majority's discussion of relevant case law includes only those cases which affirm the granting of benefits for injuries sustained at recreational or social activities. There is an equally large number of cases in which the denial of workmen's compensation benefits for accidents occurring at recreational or social activities has been affirmed on appeal. *See, e.g., Anderson v. Custom Caterers, Inc.,* 279 Ala. 360, 185 So.2d 383 (1966); *Wooten v. Roden,* 260 Ala. 606, 71 So.2d 802 (1954); *United Parcel Service v. Industrial Accident Comm.,* 172 Cal.App.2d 73, 342 P.2d 41 (1959); *Courville v. Natl. Food Stores of Louisiana, Inc.,* 174 So.2d 251 (La.App. 1965); *Landry's Case,* 346 Mass. 762, 190 N.E.2d 208 (1963); *Ethan v. Franklin Mfg. Co.,* 286 Minn. 371, 176 N.W.2d 72 (1970); *Sills v. Wert,* 139 N.Y.S.2d 132 (Sup.Ct. 1955); *Tally v. J.J. Newberry Co.,* 25 N.Y.2d 945, 305 N.Y.S.2d 156, 252 N.E.2d 634 (1969); *Stojak v. Workmen's Compensation Appeals Board,* 57 Pa.Cmwlth. 332, 426 A.2d 229 (1981); *Campbell v. Liberty Mut. Ins. Co.,* 378 S.W.2d 354 (Tex.Civ.App.1964).

However, these cases do *not* reflect a split of authority. With very few exceptions, both the cases cited in the majority opinion and the cases set out above affirm the factfinder, usually an Industrial Commission, in its determination of whether the accident occurred within the claimant's employment. While the factual issue is very close, as all of these cases reflect, it is a classic factual issue to be resolved by the finder of fact, and not by an appellate court. Even the most casual reading of the majority opinion, such as the comment on page 544 that "[h]ad the referee gone beyond page 5–71 and asked himself the questions found on page 5–85, . . . he not only would have found his task easier, but his result more just . . .," discloses that the majority does not like the result reached by the referee and the Industrial Commission, so they are taking over the factfinding function. While it is easy to sympathize with the claimant's cause, the bar and the public are entitled to expect this Court to exercise sufficient self discipline not to be led by its sympathies to violate the Industrial Commission's constitutional fact-finding authority under Art. 5, § 9, Idaho Constitution. *See Parker v. St. Maries Plywood Co.,* 101 Idaho 415, 614 P.2d 955 (1980).

For the foregoing reasons, I dissent.

SHEPARD, J., concurs.

---

**2.** In order to counter the effect of this particular finding, which Larson's treatise lists as one of the important criteria for the factfinder to consider, the majority engages in some factfinding of its own, finding that "Christmas dinner parties are not ordinarily held during working hours, and it is difficult to conceive that the employer's traditional Christmas dinner party would be held at his place of business." *Ante* at 459. There is nothing in the record to support the majority's factfinding regarding Christmas parties.